JASON P. REINSCH (Texas Bar No. 24040120)
*pro hac vice pending*
Email:  reinschj@sec.gov

Attorney for Plaintiff
Securities and Exchange Commission
801 Cherry St., Suite 1900
Fort Worth, Texas 76102
Telephone: (817) 900-2601
Facsimile: (817) 978-4927

LOCAL COUNSEL
DANIEL BLAU (Cal. Bar. No. 305008)
Email:  blaud@sec.gov
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Tel: (323) 965-3306
Fax: (213) 443-1904

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>            Plaintiff,<br><br>     vs.<br><br>MARK KORB,<br><br>         Defendant. | Case No.  2:22-cv-4031<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") files this Complaint against Defendant Mark Korb ("Korb" or "Defendant"), and alleges as follows:

## JURISDICTION AND VENUE

1. The Commission brings this action against Korb pursuant to authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)]. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa].

2. Korb has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

3. Venue is proper because Petroteq Energy, Inc.'s ("Petroteq") principal place of business is in Sherman Oaks, California, which is served by this division, and because a substantial part of the events or omissions giving rise to the claims occurred within the Central District of California.

## SUMMARY

4. This case concerns a Chief Financial Officer's reckless, or at a minimum, negligent, execution of his duties, which led to a publicly traded company's failure to fully disclose its precarious financial condition as well as vulnerabilities to key company assets. Korb, a chartered accountant, served as Petroteq's CFO and Principal Financial Officer from at least August 2014 until his resignation on October 31, 2021. During Korb's tenure, Petroteq's Executive Chairman, Aleksandr Blyumkin ("Blyumkin"), misused and misappropriated funds from the company by taking significant unreported compensation and by making undisclosed payments to a family member and his romantic partner. While serving as Petroteq's CFO, Korb disregarded critical Generally Accepted Accounting Principles ("GAAP") in preparing financial statements that failed to inform investors about

significant vulnerabilities to key assets acquired by Petroteq.  The net result was that Petroteq's 2019 and 2020 Forms 10-K, which Korb signed and certified, contained materially misleading statements.

5.     Korb acted recklessly, or at least negligently, in furthering Petroteq's misrepresentations to its investors.   First, Korb disregarded GAAP that required him to consider whether the value of certain mineral rights acquired by Petroteq was properly recorded in the financial statements.  As a result, Korb failed: (1) to consider whether the transaction was appropriately priced; and (2) to perform the necessary impairment analyses on the operating rights. *See* FASB ASC 360 *Property, Plant, and Equipment*.  Second, Korb acted recklessly, or at least negligently, in failing to inquire into and disclose transactions that benefited Blyumkin, his family, and his domestic partner.  Had Korb reasonably performed his job as Petroteq's CFO, he would have discovered the nature of these transactions and ensured that Petroteq properly disclose more than $3,065,595 in such transactions.  These undisclosed transactions were material, and particularly troublesome, given Petroteq's cash resources were severely limited.

6.     Korb also failed to take action to rectify Petroteq's ineffective internal controls over financial reporting and disclosure controls and procedures.  In spite of Petroteq's auditor identifying material weaknesses in these critical programs, Korb nonetheless signed the 2019 and 2020 Forms 10-K without ensuring that Petroteq disclosed that the deficiencies resulted in actual misappropriations and disclosure failures.

7.     By engaging in this conduct, Korb violated, and unless restrained and enjoined by the Court will continue to violate, the federal securities laws.  Specifically, he violated Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)], and Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rules 13a-14 and 13b2-1 thereunder [17 C.F.R. §§ 240.13a-14 and 240.13b2-1], and he aided and abetted Petroteq's violations of Exchange Act Sections 13(a),

13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), (b)(2)(A), and (b)(2) (B))] and Rules 12b-20, 13a-1, 13a-13, and 13a-15(a) thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13, and 240.13a-15(a)].

8.     In the interest of protecting the public from any further fraudulent activity and harm, the Commission brings this action against Korb seeking: (a) permanent injunctive relief; (b) civil penalties; and (c) all other equitable and ancillary relief to which the Court determines the Commission is entitled.

## THE DEFENDANT

9.     **Korb**, age 54, resides in Delray Beach, Florida.  He is a Chartered Accountant in South Africa and served as Petroteq's CFO from August 2014 until he resigned on October 31, 2021.  He serves or has served as the CFO for several companies, including at least two publicly held companies.

## RELATED PERSON AND ENTITY

10.     **Petroteq**, incorporated in Canada, has its principal executive offices in Sherman Oaks, California.  Its primary business is developing proprietary tar-sands mining and processing technology.  Since June 2017, its common stock has traded on the OTC Pink Market, OTCQX International Market, the TSX Venture Exchange in Canada, and the Frankfurt Stock Exchange in Germany.  Petroteq's common stock has been registered with the Commission under Exchange Act Section 12(g) since July 2019.  Petroteq has filed reports on Canada's SEDAR since May 2008.

11.     **Blyumkin** resides in Beverly Hills, California.  He controlled all activities at Petroteq, serving variously as its chairman of the board, executive chairman, president, and chief executive officer from November 2006 until his resignation on August 6, 2021.

## FACTUAL ALLEGATIONS

### A.     Background:  Petroteq's Business, Management, and Accounting.

12.     Since 2011, Petroteq's business has focused primarily on developing its proprietary tar-sands mining system called Clean Oil Recovery Technology

("CORT").  Petroteq mines surface sands in Utah known for their concentrations of tar-like lumps of hydrocarbons.  Petroteq claims that its CORT system employs a solvent-recycling process to extract almost all marketable hydrocarbons from the sands, leaving behind no hazardous waste.  As recently as March 2020, Petroteq was projecting imminent production of 300 or more barrels of oil per day.  Since September 2017, however, Petroteq has earned total revenues of only $350,144 from the sale of only a few hundred barrels of oil.  By comparison, its expenses from September 1, 2017 through August 31, 2021, have totaled more than $45 million.

13.    Korb worked part time as Petroteq's CFO and Principal Financial Officer.  He reviewed Petroteq's expenditures and determined whether to capitalize them, reconciled accounting records kept at the Petroteq plant in Utah with records kept by Petroteq's main office in California, and conferred with Blyumkin on the payment of expenses.  At the end of each fiscal year, Korb reconciled the financial transactions between Blyumkin and Petroteq.  Korb also oversaw the preparation of Petroteq's financial statements and its annual Forms 10-K and quarterly Forms 10-Q filed with Commission.  As the company's CFO and Principal Financial Officer, he certified Petroteq's Form 10-K reports for 2019 and 2020.

**B.    Korb's Participation in Petroteq's Fraudulent Conduct.**

14.    As Petroteq's CFO and Principal Financial Officer, Korb was required to exercise his duties in a reasonable manner.  These duties included an obligation to ask questions and inquire into the facts and circumstances surrounding Petroteq's business and to ultimately ensure that Petroteq accurately reported its financial condition and results of operations in its financial statements.  However, Korb's recklessness, or at a minimum negligence, led him to fail in his charge.  Under the circumstances, Korb knew or should have known that Petroteq's 2019 and 2020 Forms 10-K, which he signed and certified, contained materially misleading statements and omissions concerning:  (1) Petroteq's acquisition of leases of operating rights on Special Tar Sands Areas; (2) contingencies, risks, and the value of

the leased operating rights; (3) Blyumkin taking more money than disclosed as compensation in Petroteq's filings; and (4) Blyumkin's loans and payments to a family member and a romantic partner when Petroteq's cash resources were limited.

1.      **Korb Failed to Inquire Into Statements Concerning Petroteq's Purchase of Operating Rights on Leases in Federal Tar Sands in Utah.**

        *a.      Operating Rights Acquisition Background.*

15.      In its 2019 Form 10-K, Petroteq described its acquisition of operating rights to oil-and-gas leases administered by the U.S. Department of Interior's Bureau of Land Management ("BLM") in Utah within federally designated Special Tar Sands Areas (the "BLM Leases"). Petroteq's 2019 financial statements reflected a value of $23.8 million for the operating rights, representing 32.6% of Petroteq's total assets.

16.      The 2019 Form 10-K explained that Petroteq acquired the operating rights on the BLM Leases in two transactions. In the first transaction, Petroteq acquired a 50% interest in the rights from Company A, a private company, for $10.8 million. According to the Form 10-K, Petroteq paid Company A $1.8 million in cash on January 18, 2019, and, three months later, issued 15 million shares of Petroteq common stock priced at $0.60 with a value of $9 million. In the second transaction, covering the remaining 50% interest, Petroteq agreed to pay Company B, another private company, $13 million by issuing 30 million shares of Petroteq common stock, valued at $0.40 per share, plus $1 million in cash. Petroteq issued Company B the shares in July 2019, but made no cash payments until 2020, when it paid Company B $900,000. As of January 2022, when Petroteq filed its Form 10-Q for the period ended November 30, 2021, Petroteq still owed Company B $100,000.

17.      Companies A and B were part of a group of companies (the "Control Group") controlled by a business associate of Blyumkin. In 2013, the Control Group began purchasing Petroteq stock directly from Petroteq, eventually accumulating 8.96% of Petroteq's common stock before selling Petroteq the operating rights to the

BLM Leases, and 35.88% of Petroteq's common stock after the sale.  Blyumkin knew that Companies A and B were part of the Control Group and that the Control Group owned a large amount of Petroteq's common stock.

> ### b.      Petroteq's Public Disclosures Regarding the Acquisition of the BLM Operating Rights Omitted Material Facts and, Therefore, Were Misleading.

18.     Statements in Petroteq's 2019 Form 10-K describing the operating-rights acquisitions were misleading because they omitted material facts.  First, the Control Group qualified as a related person under Regulation S-K, Item 404 and as a related person under GAAP.  But the Form 10-K—signed and certified by Korb—failed to disclose the Control Group as such, its interest in the operating-rights transaction, and other material information.  Two months before selling the operating rights to Petroteq for $23.8 million, the Control Group acquired the same rights from a third party in exchange for a promise to pay the third party $275,000 in cash plus an option allowing the third party to purchase 20 million shares of Petroteq stock from the Control Group.  Before agreeing to sell the rights to the Control Group, the third party demanded a license to use Petroteq's CORT system on certain other tar-sand leases that the third party owned.  To facilitate the Control Group's purchase of the operating rights, Blyumkin signed an agreement in which Petroteq granted the license to the third party.  However, Petroteq's Form 10-K failed to disclose the terms of the Control Group's operating-rights purchase from the third party, including Petroteq's granting the third party a license agreement to facilitate the purchase.

19.     The Form 10-K also failed to disclose material information concerning the consideration that Petroteq paid the Control Group to purchase the rights.  Most of the $1.8 million in cash that Petroteq paid Company A on January 18, 2019, flowed back to Petroteq and Blyumkin in round-trip transactions.  A Petroteq employee also served as Company A's agent and the signatory on its bank account, and took instructions from Blyumkin concerning transactions in the account.  Four

days after Company A received the $1.8 million, Blyumkin directed the employee to transfer $253,000 to a company owned by Blyumkin's brother-in-law; $46,000 to a company owned by Blyumkin's domestic partner; and $7,500 split among three companies controlled by Blyumkin.  Over the next five days, Blyumkin also withdrew $173,000 of these funds from Petroteq's bank account for himself thereby bringing his total benefit to $479,500.  On the same day, he directed the employee to transfer $1.4 million to two other Control Group entities.  These two entities transferred $1.39 million back to Petroteq the next day for the purpose of purchasing Petroteq equity securities.

20.     The Form 10-K, however, failed to disclose any of the transaction (identified in Paragraph 19, above) among the transactions listed in the Form 10-K under the heading "Recent Sales of Unregistered Securities."

### c.     Korb Failed to Inquire Into the Acquisition of the Operating Rights.

21.     Blyumkin did not proactively disclose to Korb the nature of the transactions leading to Petroteq's acquisition of the operating rights to the BLM Leases.  However, it was incumbent on Korb to make *at least some inquiry* into the details of these transactions, particularly because the operating rights acquisition accounted for nearly 1/3 of Petroteq's total assets.  Korb failed in this regard and made no effort to inquire into these critical transactions.  Therefore, as CFO and Principal Financial Officer, Korb was at least negligent in signing and certifying Petroteq's misleading Form 10-K

### 2.     Korb's Inaction Led Petroteq to Make Misleading Statements Concerning the Risks, Contingencies, and Value of its Operating Rights on the BLM Leases.

22.     Korb conducted no assessment of the BLM operating rights, even though the BLM leases remained in suspension and the operating rights—which account for 1/3 of Petroteq's total assets—never generated revenues.  Petroteq's Forms 10-K for

2019 and 2020 also contained misleading statements concerning risks, contingencies, and value of Petroteq's operating rights on the BLM Leases.  Until the BLM converts each of the BLM Leases to a Combined Hydrocarbon Lease ("CHL"), Petroteq cannot legally exercise its operating rights on the leases to mine tar sands.  While the Forms 10-K explained that the "BLM Leases are in 'suspension status' under BLM regulations until the new CHLs are issued," Petroteq failed to disclose the numerous material facts concerning CHL conversion.

23.     First, had Korb reasonably inquired into the transaction, he would have learned that Petroteq had not obtained record title to the operating rights, and that, as a result, the BLM would not consider any request from Petroteq to operate the rights or complete a CHL conversion.

24.     Second, even if Petroteq perfected title to the operating rights, one of the BLM Leases—constituting approximately 60% of the leased acreage—could no longer be converted to a CHL.  Had Korb reasonably made any efforts to confirm the title and nature of the rights, he would have learned that on October 13, 2020, the registered owner of the lease on this acreage (a party wholly separate from the Control Group, the third-party seller, and Petroteq) elected not to convert the lease to a CHL.  No new CHL-conversion application could be filed, because the deadline for doing so had passed.  Therefore, mining tar sands on this acreage was prohibited.

25.     Third, the remaining 40% of the acreage was subject to undisclosed risks and costs associated with meeting the regulatory requirements of not only the BLM, but also of the National Park Service ("NPS").  No one, including Petroteq, prepared the current operational plan and environmental-impact statements necessary to proceed with the CHL conversion of this acreage.  Petroteq failed to disclose the anticipated costs or timing associated with preparing such an operational plan or environmental-impact statement, and it otherwise failed to disclose how its tar-sands mining would be compatible with BLM and NPS requirements.

26.     Despite the title deficiency and other contingencies described in

Paragraphs 23-25, above, the financial statements included in Petroteq's Forms 10-K for 2019, 2020, and 2021 each valued the operating rights at $23.8 million, Petroteq's original purchase price.  This valuation failed to take into consideration whether the above-referenced contingencies impaired the value of the operating rights.  Petroteq's Forms 10-K assured investors that the company "assesses its unproved properties for impairment annually, or more frequently if events or changes in circumstances dictate that the carrying value of those assets may not be recoverable."

27.    As Petroteq's CFO, Korb reasonably should have assessed the ramifications of the limitations on Petroteq's acquisition—and the ultimate valuation reported to the public.  However, he made no such effort and certified to false and misleading reports filed with the Commission.

### 3.    Korb Failed to Discover That Blyumkin's Compensation Exceeded the Reported Compensation.

28.    Korb was also reckless, or at least negligent, in not discovering that Blyumkin's compensation was not accurately reflected in Petroteq's 2019 and 2020 Forms 10-K or in its 2018, 2019, and 2020 financial statements.  Regulation S-K, Item 402, "requires clear, concise and understandable disclosure of all plan and non-plan compensation awarded to, earned by, or paid to" executive officers and directors.

29.    Blyumkin did not, however, receive salary or director-fee compensation in scheduled payments of a set amount on a regular interval.  Instead, he took frequent cash withdrawals from Petroteq's bank accounts in amounts, and at times, of his choosing.  Petroteq had no controls in place requiring contemporaneous oversight or justification for Blyumkin's withdrawals.  In fiscal years 2018, 2019, and 2020 combined, Blyumkin made more than 230 such withdrawals.

30.    For fiscal year 2020, Blyumkin's salary was initially set at $240,000 (as in prior years).  However, Blyumkin's unilateral withdrawals throughout the year resulted in his receipt of $366,254—$126,254 more than his initial salary amount.  In

its 2020 Form 10-K, Petroteq disclosed a salary increase of the same amount for the period, but failed to disclose that the increase resulted from Blyumkin's unmonitored cash withdrawals, and not from, for example, an approved raise by the company's board of directors.

31.     Petroteq's 2019 and 2020 Forms 10-K represented that the company "did not provide any compensation that would be considered a perquisite or personal benefit to executive officers."  From September 25, 2017, through August 25, 2020, however, Petroteq, at Blyumkin's direction, made payments totaling $152,190 to a company Blyumkin owned, and which he used to lease and insure automobiles used by him and his family.

32.     However, Korb recklessly, or at least negligently, allowed Blyumkin's self-dealing to go unreported by Petroteq.  Again, had Korb reasonably inquired into what compensation Blyumkin was actually receiving, Petroteq's investors would have had the chance to know what was really going on with the company's finances.

## 4.     Korb Failed to Discover Related-Person Transactions and Arrangements With Blyumkin's Sister and His Domestic Partner.

33.     Regulation S-K, Item 404, requires disclosure of "related person transactions."   Item 404 defines "related person" to include immediate family members, which would include Blyumkin's sister.  Similarly, Instruction 1 to Item 404 of Regulation S-K, defines "related person" to include "any person (other than a tenant or employee) sharing the household of" an executive officer or director of the registrant.  Therefore, both Blyumkin's sister and his domestic partner were "related persons" during the relevant time period, and Petroteq should have disclosed payments to them.  It did not, and Korb should have caught this.

### a.     Petroteq's Payments to Blyumkin's Sister.

34.     In fiscal years 2018 and 2019, Blyumkin's sister performed legal services for Petroteq under a retainer agreement calling for payments of up to

$35,000 per month.  In total, she received $833,500 from Petroteq in 2018 and $326,750 in 2019.  However, Petroteq made payments to her in these periods, which included payments in addition to compensation for legal services.  In 2018, Petroteq's payments to Blyumkin's sister included a $300,000 loan, which she repaid the same year, and a $250,000 payment made at Blyumkin's direction and on his behalf.  Korb recorded the $250,000 payment—for which Blyumkin's sister provided no services to Petroteq—as a reduction to the amount that Petroteq purportedly owed to Blyumkin in an officer-loan account.  In 2019, at Blyumkin's direction, Petroteq made a $50,000 payment to her, again in exchange for no services to Petroteq.

35.     Korb knew that Petroteq compensated Blyumkin's sister for legal services and that she had borrowed money from the company.  However, Korb failed to identify any of the payments to the sister as related-person transactions, regardless of whether the payments were made pursuant to a legal-services retainer, as a loan, or otherwise, either as a Regulation S-K disclosure item or in the financial statements in Petroteq's 2019 and 2020 Forms 10-K.

### b.     Petroteq's Payments to Blyumkin's Domestic Partner.

36.     From September 2017 through May 2020, Blyumkin directed Petroteq to engage in transactions with his domestic partner, who was the mother of his child and with whom he had shared a residence.  As a result of these transactions, Petroteq paid Blyumkin's domestic partner $377,300 in fiscal year 2018, $319,000 in fiscal year 2019, and $578,303 in fiscal year 2020, for a total of $1,274,603.

37.     Korb was reckless, or at least negligent, in not discovering these significant payments to the domestic partner or inquiring as to the basis for these payments.

### C.     Korb Took No Action to Rectify Petroteq's Ineffective Internal Controls Over Financial Reporting and Disclosure Controls and Procedures.

38.     Korb was reckless, or at least negligent, in not attempting to improve

Petroteq's deficient internal controls over financial reporting and disclosure controls and procedures. Korb signed the 2019 and 2020 Forms 10-K knowing about Petroteq's controls deficiencies. Petroteq's auditor identified material weaknesses in Petroteq's internal control over financial reporting from at least 2018 through 2020. In its reports to Petroteq, which Korb received and reviewed, the auditor noted that these deficiencies included:

    a.    Accounting policies not formally documented, including with respect to assessing any impairments;

    b.    Journal entries not subjected to any significant detailed review by management;

    c.    Transactions not adequately documented;

    d.    Limited segregation of duties between custody of assets and control over accounting records; and

    e.    Single-signature authority over Petroteq's operating bank accounts.

39.    The auditor's 2018 report to Petroteq's audit committee noted that a material amount of expenses paid by the company were personal expenditures by Blyumkin, which increased the risk of misstatements and misappropriations. Petroteq's 2019 and 2020 Forms 10-K disclosed that, because of a lack of segregation of duties, its internal control over financial reporting and its disclosure controls and procedures were ineffective. Despite the auditor's warning and Petroteq's acknowledgement of its ineffective internal control over financial reporting and its disclosure controls and procedures, Korb took no steps to implement sufficient controls and procedures.

40.    Nonetheless, Korb signed the 2019 and 2020 Forms 10-K knowing about the controls deficiencies. Furthermore, Petroteq did not disclose that the deficiencies resulted in actual misappropriations and disclosure failures.

### FIRST CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**

**Violations of Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)]**

41.     Plaintiff re-alleges and incorporates paragraphs 1 through 40 of this Complaint by reference as if set forth verbatim in this Claim.

42.     Among other things, as Petroteq's CFO and Principal Financial Officer, Korb was required to exercise his duties in a reasonable manner.  These duties included an obligation to ask questions and inquire into the facts and circumstances surrounding Petroteq's business and to ultimately ensure that Petroteq accurately reported its financial condition in its financial statements.  In this regard, Korb was at least negligent in not executing these duties.  Under the circumstances, Korb knew or reasonably should have known that Petroteq's 2019 and 2020 Forms 10-K, which he signed and certified, contained materially misleading statements.  The misleading statements and omissions concerned:  (1) Petroteq's acquisition of leases of operating rights on the BLM Leases; (2) contingencies, risks, and the value of the leased operating rights; (3) Blyumkin taking more money than disclosed as compensation in Petroteq's filings; and (4) Blyumkin's loans and payments to a family member and a romantic partner when Petroteq's cash resources were limited.

43.     By engaging in the acts and conduct alleged herein, Defendant, directly or indirectly, in the offer or sale of a security, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, has at least negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

44.     By reasons of the foregoing, Korb has violated, and unless enjoined will continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(3)].

## SECOND CLAIM FOR RELIEF

### Violations of the Reporting Provisions of the Exchange Act

### Aiding and Abetting Violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, and 13a-13

45.     Plaintiff re-alleges and incorporates paragraphs 1 through 40 of this Complaint by reference as if set forth verbatim in this Claim.

46.     Petroteq's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)].  Therefore, pursuant to Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], Petroteq was obligated to file various reports with the Commission, including quarterly reports on Form 10-Q and annual reports on Form 10-K.  Petroteq, in fact, filed Forms 10-K for the fiscal years ended 2019 and 2020, and Forms 10-Q for the fiscal quarters ended May 31, 2019, November 30, 2019, February 29, 2020, May 31, 2020, and November 30, 2020.  The financial reports and information contained in these Forms 10-K and 10-Q, however, contained untrue statements of material fact as a result of Korb's actions and inactions.

47.     Korb aided and abetted Petroteq's filing of misleading Forms 10-K and 10-Q by executing these reports while recklessly performing his duties as CFO and the Principal Financial Officer.  Among other things, Korb failed to: (a) consider whether the BLM Lease operating rights transaction was appropriately priced; (b) perform the necessary impairment analyses on the operating rights; and (c) inquire into and disclose transactions that benefited Blyumkin, his sister, and his domestic partner.

48.     By engaging in the acts and conduct alleged herein, Korb directly or indirectly, singly or in concert with others, aided and abetted Petroteq's filing of annual and quarterly reports required to be filed with the Commission pursuant to Section 13(a) of the Exchange Act and the rules and regulations promulgated thereunder that: (i) contained untrue statements of material fact; (ii) failed to include,

in addition to the information required to be stated in such report, such further material information as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading; and/or (iii) failed to disclose any information required to be disclosed therein.

49.     By reason of the foregoing, Korb has aided and abetted, and unless enjoined will continue to aid and abet, violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

## THIRD CLAIM FOR RELIEF

### Violations of the Books and Records Provisions of the Exchange Act

### Aiding and Abetting Violations of Exchange Act Section 13(b)(2)(A)

50.     Plaintiff re-alleges and incorporates paragraphs 1 through 40 of this Complaint by reference as if set forth verbatim in this Claim.

51.     Petroteq recorded the BLM Lease operating rights at its purported purchase price of $23.8 million, but by affecting the "round-trip" transaction as described in Paragraph 19, above, this transfer of funds effectively reduced Petroteq's cost by approximately $1.8 million.  The asset was therefore overvalued in Petroteq's books and records by at least approximately $1.8 million.  Thus, Petroteq violated Section 13(b)(2)(A).

52.     Korb aided and abetted Petroteq's violations of Section 13(b)(2)(A). Korb, a chartered accountant with significant gatekeeping responsibilities as Petroteq's CFO, acted at least recklessly in failing to confirm critical aspects of the operating-rights acquisition, including whether Petroteq's title was perfected, and the risks, contingencies, and costs associated with exploiting the rights.  Any reasonable inquiry into such matters, at the time of acquisition and on a continuing basis, as Petroteq continued to claim essentially unqualified ownership of the rights, would have revealed that: (a) Petroteq's title was not perfected; (b) it had lost the ability to

pursue tar-sands operations on one of the BLM Leases; and (c) the Special Tar Sands rights faced severe regulatory risks to approval of their operation.  An appropriate and reasonable impairment analysis of the asset would have revealed its value to be impaired.  But Korb performed no such analysis.  Instead, he substantially assisted Petroteq's violations, by making and maintaining books and records which did not accurately report the value of the operating rights.  Korb also failed to inquire into the cash transfers to Blyumkin's romantic partner and his sister and why they were made when Petroteq had almost no income from operations, which would have revealed their related-person nature.

53.     By engaging in the acts and conduct alleged herein, Korb, directly or indirectly, singly or in concert with others, aided and abetted Petroteq, an issuer whose securities were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], in failing to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of the issuer.

54.     By reason of the foregoing, Korb has aided and abetted, and unless enjoined will continue to aid and abet, violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## FOURTH CLAIM FOR RELIEF

**Violations of the Books and Records Provisions of the Exchange Act**

**Aiding and Abetting Violations of Exchange Act Section 13(b)(2)(B)**

55.     Plaintiff re-alleges and incorporates paragraphs 1 through 40 of this Complaint by reference as if set forth verbatim in this Claim.

56.     Petroteq did not devise and maintain internal accounting controls sufficient to provide reasonable assurances that, among other things, the financial statements are presented in accordance with GAAP.  It had insufficient controls to detect and prevent Blyumkin from directing assets to his companies, to his sister, and

to his domestic partner in undisclosed related-party transactions benefitting him at Petroteq's expense.  And it had insufficient controls to provide reasonable assurances that company liabilities were accurately reflected in its financial statements.

57.    Korb aided and abetted Petroteq's internal controls violations.  Despite the warnings of Petroteq's auditor, and despite Petroteq acknowledging for years in its filings that its internal financial controls were ineffective, Korb, a chartered accountant with significant gatekeeping responsibilities as Petroteq's CFO, acted at least recklessly in not establishing controls by which Petroteq could effectively oversee related-party transactions, including transactions involving Blyumkin.  *See* Item 404(b) of Regulation S-K (requiring policies for the review and approval of related-party transactions, and disclosure of such).  Nor did he establish controls to provide reasonable assurances that company assets such as the operating rights, were subject to periodic impairment analysis as required under GAAP.

58.    By engaging in the acts and conduct alleged herein, Korb, directly or indirectly, singly or in concert with others, aided and abetted Petroteq, an issuer whose securities were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], in failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general or specific authorization; (ii) transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets; (iii) access to assets was permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

59.    By reason of the foregoing, Korb aided and abetted, and unless enjoined will continue to aid and abet, violations of Section 13(b)(2)(B) of the Exchange Act

[15 U.S.C. § 78m(b)(2)(B)].

## FIFTH CLAIM FOR RELIEF

### Circumventing or Failing to Implement Internal Controls under Exchange Act
### Violations of Exchange Act Section 13(b)(5) and Rule 13b2-1

60.      Plaintiff re-alleges and incorporates paragraphs 1 through 40 of this Complaint by reference as if set forth verbatim in this Claim.

61.      Petroteq's auditor identified material weaknesses in Petroteq's internal control over financial reporting from at least 2018 through 2020.  Korb reviewed the auditor's report and knew of Petroteq's internal controls weaknesses, but he knowingly failed to implement sufficient controls.

62.      By engaging in the acts and conduct alleged herein, Korb: (i) knowingly circumvented or knowingly failed to implement a system of internal accounting controls, and/or (ii) knowingly falsified, or caused to be falsified, Petroteq's books, records, and/or accounts.

63.      By reason of the foregoing, Korb has violated, and unless enjoined will continue to violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] thereunder.

## SIXTH CLAIM FOR RELIEF

### Violations of Certification Rules of the Exchange Act
### Violations of Exchange Act Rule 13a-14

64.      Plaintiff re-alleges and incorporates paragraphs 1 through 40 of this Complaint by reference as if set forth verbatim in this Claim.

65.      Petroteq's auditor identified material weaknesses in Petroteq's internal controls over financial reporting from at least 2018 through 2020.  Nonetheless, Korb, who reviewed the auditor's report and knew of Petroteq's internal controls weaknesses, signed Petroteq's 2019 and 2020 Forms 10-K filings, thereby certifying

that Petroteq had designed reasonable disclosure controls and procedures and internal control over financial reporting.  Those certifications were false.

66.     By engaging in the acts and conduct alleged herein, Korb filed or caused to be filed annual and quarterly reports on Forms 10-K and 10-Q on behalf of Petroteq, which contained a certification required by Rule 13a-14 [17 C.F.R. § 240.13a-14] that included untrue statements of material fact, or failed to include, in addition to the information required to be stated in such certification, such further material information was necessary to make the required statements, in light of the circumstances under which they were made, not misleading, or failed to disclose any information required to be disclosed therein.

67.     By reason of the foregoing, Korb has violated, and unless enjoined will continue to violate, Rule 13a-14 [17 C.F.R. § 240.13a-14] promulgated under the Exchange Act.

## SEVENTH CLAIM FOR RELIEF

### Violations of Certification Rules of the Exchange Act

### Aiding and Abetting Violations of Exchange Act Rule 13a-15(a)

68.     Plaintiff re-alleges and incorporates paragraphs 1 through 40 of this Complaint by reference as if set forth verbatim in this Claim.

69.     Exchange Act Rule 13a-15(a) requires Petroteq, an issuer whose securities were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], to design and maintain disclosure controls and procedures and internal controls over financial reporting.  Petroteq did not design or maintain these required controls. In fact, Petroteq's auditor identified material weaknesses in Petroteq's internal control over financial reporting from at least 2018 through 2020.

70.     Korb aided and abetted Petroteq's failure to design and maintain disclosure controls and procedures and internal controls over financial reporting. Despite the warnings of Petroteq's auditor, and despite Petroteq acknowledging for years in its filings that its internal financial controls were ineffective, Korb, a

chartered accountant with significant gatekeeping responsibilities as Petroteq's CFO, acted at least recklessly in not establishing controls by which Petroteq could effectively oversee related-party transactions, including transactions involving Blyumkin. *See* Item 404(b) of Regulation S-K (requiring policies for the review and approval of related-party transactions, and disclosure of such). Nor did he establish controls to provide reasonable assurances that company assets such as the operating rights, were subject to periodic impairment analysis as required under GAAP.

71. By reason of the foregoing, Korb aided and abetted, and unless enjoined will continue to aid and abet, Petroteq's violations of Rule 13a-15(a) of the Exchange Act [17 C.F.R. § 240.13a-15(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

a. Making findings of fact and conclusions of law that Korb committed the alleged violations;

b. Permanently enjoining Korb, pursuant to Rule 65(d) of the Federal Rules of Civil Procedure, from violating Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)], and Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rules 13a-14 and 13b2-1 thereunder [17 C.F.R. §§ 240.13a-14 and 240.13b2-1], and from aiding and abetting violations of Exchange Act Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), (b)(2)(A), and (b)(2)(B))] and Rules 12b-20, 13a-1, 13a-13, and 13a-15(a) thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13, and 240.13a-15(a)];

c. Ordering Korb to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

d.  Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

e.  Granting such other and further relief as this Court may determine to be just and necessary.

Dated:  June 13, 2022

*/s/ Daniel Blau*
Daniel Blau
Attorney for Plaintiff
Securities and Exchange Commission